RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 17a0100p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

PROGRESSIVE DISTRIBUTION SERVICES, INC.,

　　　　　　　　　　　　　*Plaintiff-Appellant*,

　　*v.*

UNITED PARCEL SERVICE, INC.; UNITED PARCEL
SERVICE, INC.; UNITED PARCEL SERVICE OF AMERICA,
INC., UNITED PARCEL SERVICE MARKET DRIVER, INC.,

　　　　　　　　　　　　　*Defendants-Appellees*.

⎫
⎪
⎪
⎬　No. 16-1830
⎪
⎪
⎭

---

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:14-cv-00430—Gordon J. Quist, District Judge.

Argued: January 26, 2017

Decided and Filed: May 3, 2017

Before: GUY, CLAY, and GRIFFIN, Circuit Judges.

---

## COUNSEL

**ARGUED:** Jeffrey A. Sadowski, HOWARD & HOWARD ATTORNEYS PLLC, Royal Oak,
Michigan, for Appellant. Tywanda Harris Lord, KILPATRICK, TOWNSEND & STOCKTON
LLP, Atlanta, Georgia, for Appellees. **ON BRIEF:** Jeffrey A. Sadowski, Michael F. Wais,
HOWARD & HOWARD ATTORNEYS PLLC, Royal Oak, Michigan, for Appellant. Tywanda
Harris Lord, Laura C. Miller, Rhojonda D.C. Thomas, KILPATRICK, TOWNSEND
& STOCKTON LLP, Atlanta, Georgia, for Appellees.

　　　CLAY, J., delivered the opinion of the court in which GRIFFIN, J., joined, and GUY, J.,
joined in part. GUY, J. (pp. 23–24), delivered a separate opinion concurring in part and
dissenting in part.

---

**OPINION**

---

CLAY, Circuit Judge.   Plaintiff, Progressive Distribution Services, Inc. ("Progressive") brought suit against Defendants, United Parcel Service, Inc., a Delaware corporation, United Parcel Service, Inc., an Ohio corporation, United Parcel Service of America, Inc., a Delaware corporation, and United Parcel Service Market Driver, a Georgia corporation (collectively referred to herein as "UPS"), alleging that UPS violated the Lanham Act, 15 U.S.C. § 1051, *et seq.*, the Michigan Consumer Protection Act, Mich. Comp. Laws § 455.091, *et seq.*, and the common law governing service marks, trademarks and unfair competition.   The district court granted summary judgment in favor of UPS.   For the reasons set forth below, we **AFFIRM** the district court's judgment.

**BACKGROUND**

**I.      Factual background**

Founded in 1984, Progressive is a business located in Western Michigan that provides logistical services to companies in order to facilitate online businesses' shipping and handling of products.   The company offers several different services under multiple trademarks, including "OrderLink," the trademark at issue in this appeal. OrderLink is a service under which Progressive develops a website on behalf of its clients and assumes the responsibility for ensuring that the clients' products are delivered to customers in an efficient manner.   The OrderLink service typically requires a four-to-six week set-up period. Customers commit to a two year contract and the cost of signing up generally ranges from a few thousand dollars to twenty-five thousand dollars.

Progressive registered the OrderLink trademark September 21, 2004, but alleges that it has been using the mark for at least 19 years.   The company spent approximately $2.5 million dollars advertising the OrderLink mark over the past twenty years, of which only $159,774.05 was spent between 2007 and 2013.   Progressive's advertising for OrderLink included telephone

calls, email communications, trade shows, mailers, the internet, word of mouth, and trade magazines.

UPS is one of the world's largest package shipping companies. Its brand is easily recognizable by its brown-and-gold color scheme and is otherwise well-known by most consumers. Certain of UPS's customers include small volume shippers who operate businesses on Amazon and eBay web marketplaces. In 2012, UPS's Customer Technology Marketing ("CTM") submitted a proposal to create a new interface in order to facilitate the shipping of orders from eBay and Amazon. The service afforded UPS's existing Amazon and eBay customers the ability to import their orders directly into UPS's shipping application. This allowed the aforementioned customers to create shipping labels and process requests more easily.

Consistent with its standard process, UPS's Brand Manager, Christine Allen, developed a list of potential names for the new service. Following Allen's initial search of proposed names on the U.S. Patent and Trademark Office ("USPTO") website, she concluded that the term "orderlink" was not available because it was used by Progressive and another unrelated shopping software company. Additional searches revealed that the terms "order" and "link" were commonly used together by other companies in the marketplace. Upon further review of Progressive's website, the CTM team concluded that Progressive's order fulfillment services differed substantially from the free shipping application UPS intended to offer its Amazon and eBay merchant customers. Accordingly, the CTM team settled on the name "UPS OrderLink" in August 2013.

UPS submitted an application to the USPTO to register "UPS OrderLink" as a mark, but this application was rejected on November 25, 2013 based on a likelihood of confusion with Progressive's mark. Nonetheless, UPS launched the UPS OrderLink software on December 28, 2013. It operated as a free service that enabled eBay and Amazon sellers to simplify their shipping and processing of orders. The service was accessible only through UPS's website by clicking on a link that brought customers to the application. UPS advertised the service primarily on its website by using internal banner ads.

On February 17, 2014, Progressive sent UPS a cease-and-desist letter demanding that UPS stop the use of the name "UPS OrderLink." In response, UPS approached Progressive about negotiating a co-existence agreement. While awaiting Progressive's response, UPS explored the possibility of changing the name of "UPS OrderLink." By mid-April, when no response was forthcoming, UPS began the process of changing the name of its service to "Ship Marketplace Orders." The transition was finalized on August 15, 2014 and UPS abandoned the name.

## II.     Procedural History

Progressive initiated the suit by filing a complaint on April 17, 2014 in the Western District of Michigan. Progressive alleged violations of the Lanham Act, 15 U.S.C. § 1051, *et seq.*, the Michigan Consumer Protection Act, Mich. Comp. Laws § 445.091, *et seq.*, and the common law governing service marks, trademarks and unfair competition. On November 23, 2015, UPS moved for summary judgment, claiming as a matter of law that Progressive could not establish likelihood of confusion. The district court agreed, and on May 16, 2016, granted summary judgment in favor of UPS. Progressive then filed a timely notice of appeal in the instant case.[1]

## DISCUSSION

## I.     Standard of Review

A district court's grant of summary judgment is reviewed *de novo. V & M Star Steel v. Centimark Corp.*, 678 F.3d 459, 465 (6th Cir. 2012). Summary judgment is appropriate only when the evidence, taken in the light most favorable to the nonmoving party, establishes that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis omitted).

---

[1]Progressive has waived its Michigan and common law claims while maintaining its Lanham Act claims.

## II.    Analysis

Progressive alleges a claim of trademark infringement and unfair competition under 15 U.S.C. §§ 1114 and 1125 of the Lanham Act. To prevail upon a trademark infringement and unfair competition claim, Progressive must establish that UPS's trademark creates a likelihood of confusion regarding the origin of goods or services offered by the respective parties. *See Therma-Scan, Inc. v. Thermoscan, Inc.*, 295 F.3d 623, 629 (6th Cir. 2002); *see also Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr.*, 109 F.3d 275, 280 (6th Cir. 1997) ("The touchstone of liability under § 1114 is whether the defendant's use of the disputed mark is likely to cause confusion among consumers regarding the origin of the goods offered by the parties."); *Holiday Inns, Inc. v. 800 Reservation, Inc.*, 86 F.3d 619, 622–23 (6th Cir. 1996) (explaining that a party seeking to avoid summary judgment in a case alleging trademark infringement and unfair competition, in violation of 15 U.S.C. §§ 1114 and 1125(a), "must establish that genuine factual disputes exist concerning those factors that are material to whether confusion is likely in the marketplace as a result of the alleged infringement").

This Court has set forth an eight-factor test in order evaluate whether there is a likelihood of confusion: (1) strength of the plaintiff's mark; (2) relatedness of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) likely degree of purchaser care; (7) defendant's intent in selecting the marks; and (8) likelihood of expansion of the product lines. *Frisch's Restaurants, Inc. v. Elby's Big Boy of Steubenville, Inc.*, 670 F.2d 642, 648 (6th Cir. 1982); *see also Groeneveld Transp. Efficiency, Inc. v. Lubecore Int'l, Inc.*, 730 F.3d 494, 509 (6th Cir. 2013). Not all of these factors will be relevant in every case, and in the course of applying them, "[t]he ultimate question remains whether relevant consumers are likely to believe that the products or services offered by the parties are affiliated in some way." *Homeowners Grp., Inc. v. Home Mktg. Specialists, Inc.*, 931 F.2d 1100, 1107 (6th Cir. 1991). In applying these factors, we recognize that they "imply no mathematical precision, but are simply a guide to help determine whether confusion is likely." *Id.* To create a triable issue of fact, the plaintiff's "burden is to identify a disputed factor or set of factors whose resolution would necessarily be dispositive on the likelihood of confusion issue." *Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*, 280 F.3d 619, 646 (6th Cir. 2002).

We have recognized four different types of trademark infringement: palming off, confusion of sponsorship (also known as "association"), reverse confusion of sponsorship, and dilution.  *Ameritech, Inc. v. Am. Info. Techs. Corp.*, 811 F.2d 960, 964–65 (6th Cir. 1987). Progressive's claim rests upon a theory of reverse confusion.  This Court has explained:

> A reverse confusion claim differs from the stereotypical confusion of source or sponsorship claim.  Rather than seeking to profit from the goodwill captured in the senior user's trademark, the junior user saturates the market with a similar trademark and overwhelms the senior user.  The public comes to assume the senior user's products are really the junior user's or that the former has become somehow connected to the latter.  The result is that the senior user loses the value of the trademark—its product identity, corporate identity, control over its goodwill and reputation, and ability to move into new markets.

*Id.* at 964.  Regardless of the theory of infringement alleged, a plaintiff must show that there is a likelihood of consumer confusion.[2]  *See Therma-Scan*, 295 F.3d at 630 (undertaking the same eight-factor analysis even though plaintiff alleged infringement under theories of both palming off and reverse confusion).

Prior to engaging in our analysis of the *Frisch* factors, we are called upon to decide what level of deference is to be accorded an initial USPTO decision that denied UPS's trademark of "UPS OrderLink" on the basis of its finding that there was a likelihood of confusion with Progressive's mark.

### A.       Deference to USPTO Decision

UPS filed an application for the "UPS OrderLink" mark.  When a new application is filed before the USPTO, an examiner reviews the application and makes a preliminary determination regarding whether the applied-for mark is entitled to registration.  "A complete review includes a search [of the USPTO database] for conflicting marks and an examination [of] the written

---

[2]Despite Progressive's assertions to the contrary, this Circuit has never held that the precise theory of infringement impacts the touchstone of the analysis—likelihood of confusion.  As Progressive concedes, this Court looks to the eight-factor test to determine whether or not there is a likelihood of confusion.  It is unclear what Progressive means when it states that the district court "applied the wrong standard."  But regardless, at no point in its brief does Progressive actually articulate an alternative standard for this Court to review.  Moreover, this Court has already stated that "[i]n *every case*, 'the ultimate question remains whether relevant customers are likely to believe that the products or services offered by the parties are affiliated in some way.'" *Leelanau Wine Cellars, Ltd. v. Black & Red, Inc*, 502 F.3d 504, 515 (2007) (quoting *Homeowners Grp.*, 931 F.2d at 1107) (emphasis added).

application, the drawing, and any specimen." U.S. Patent and Trademark Office, *Is a trademark application right for you?* (Nov. 10, 2014), https://www.uspto.gov/trademarks-getting-started/trademark-process#step2. The principal factors considered by the examining attorney in determining whether there would be a likelihood of confusion are: similarity of the marks; and the commercial relationship between the goods and/or services listed in the application. This notably excludes many of the factors that courts consider in a Lanham infringement action—including a consideration of the manner in which the marks are actually used in the marketplace. *See Wynn Oil Co. v. Thomas*, 839 F.2d 1183, 1187 (6th Cir. 1988) ("Instead, a court must determine, in the light of *what occurs in the marketplace*, whether the mark "will be confusing to the public when singly presented.") (internal citations omitted) (emphasis added). The examiner, upon review of the limited information before her,[3] issues a preliminary holding about whether or not the future mark may be eligible for trademark protection or whether it is confusingly similar to another mark. At this juncture, the applicant may present further arguments and evidence in order to convince the examiner that its preliminary decision is incorrect. Upon this showing, the examiner can withdraw the objection and pass the application to the next step in the registration process, or maintain the objection. UPS declined to file additional evidence before the examiner.

As a threshold matter, the parties dispute the amount of deference to which a USPTO examiner's decision is entitled before the district court. Progressive claims that the district court erred by ignoring the USPTO's "factual determination for rejecting the UPS [OrderLink] mark in light of Progressive's incontestable registration for [OrderLink] and its exclusive right for 'order fulfillment services.'" (Appellant Br., at pg. 21–22). Progressive advances no case law in support of its theory that the USPTO's factual findings must be afforded strong consideration before the district court. Nor does Progressive elaborate upon the extent of deference a federal court should grant to a USPTO's preliminary finding that a mark cannot be trademarked. In turn, we see no error in the fact that the district court decided not to defer to the USPTO examiner's preliminary findings concerning trademark eligibility.

---

[3]UPS submitted a three page document containing the "OrderLink" electronic application for a trademark, the mark in black and white block letters, UPS's corporate information, and a short description of the applied for services.

This Court has already held that a trademark examining attorney's opinion is not entitled to a procedural presumption or a reasonable inference drawn in its favor in circumstances when the USPTO fails to consider the same evidence that is subsequently placed in front of the district court. *See Mktg. Displays, Inc. v. TrafFix Devices, Inc.*, 200 F.3d 929, 934 (6th Cir. 1999), *rev'd on other grounds* 532 U.S. 23 (2001). Similarly, the Ninth Circuit has held that a preliminary determination by a low-level USPTO administrator should not be accorded much weight, especially where the USPTO officer did not have access to the same type of information that informs a likelihood of confusion analysis. *See Carter–Wallace, Inc. v. Procter & Gamble Co.*, 434 F.2d 794, 802 (9th Cir. 1970) ("Any such determination made by the Patent Office under the circumstances just noted must be regarded as inconclusive since [it is] made at its lowest administrative level."). Finally, the Third Circuit has more recently endorsed the Ninth Circuit's decision, noting that while an "initial [US]PTO determination . . . may be considered, it need not be given weight when the [US]PTO attorney did not review all the evidence available to the District Court." *A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 220–21 (3d Cir. 2000).

We reaffirm our previous holding and expressly concur in our sister circuits' decisions. UPS presented no evidence to the examiner regarding the manner in which the two marks are actually used in the marketplace. In a trademark infringement action, such a showing is integral to any evaluation of the likelihood of confusion. Although Progressive asserts that the examining attorney relied upon all available evidence submitted by UPS, and thus "evidence UPS presumably considered to be the best they could provide in their favor" (Appellant Br., at pg. 22 n.9), this argument misses the point. Regardless of whether the evidence presented to the examiner was the best evidence or the only available evidence, what is clear is that the examining attorney did not weigh *all* the relevant evidence normally considered by a court in a trademark infringement action. Therefore, the examiner's analysis was incomplete. Furthermore, the decision of the examiner was a preliminary one. It did not even bind the examiner, let alone speak with the full weight of the Trademark Trial and Appeal Board. In the absence of any case law presented by Progressive to the contrary, we see no reason why such a low-level determination should be entitled to any weight before a federal court. That is not to say, of course, that a district court cannot look to the USPTO opinion to inform its conclusions

on trademark analysis; rather, we believe no obligation exists to do so. Accordingly, the district court did not err when it accorded no deference to the USPTO's decision. We now turn to the *Frisch* factors to evaluate whether Progressive can avoid summary judgment on its trademark infringement action.

**B.     Eight-factor Test for Infringement**

This Court considers the question of whether there is a likelihood of confusion to be a mixed question of fact and law. *See Data Concepts, Inc. v. Digital Consulting, Inc.*, 150 F.3d 620, 624 (6th Cir. 1998) *abrogated on other grounds by Hana Fin., Inc. v. Hana Bank*, 135 S. Ct. 907, (2015). Any dispute about the evidence that pertains to the eight factors presents a factual issue. *Id.* at 624 (noting that "[i]f the facts relevant to the applicable factors are contested, factual findings must be made with respect to each of these factors"). In contrast, "the further determination of whether a given set of foundational facts establishes a likelihood of confusion is a legal conclusion." *Homeowners Grp.*, 931 F.2d at 1107; *Data Concepts*, 150 F.3d at 624 (explaining that "the balancing of [the factual] findings to determine the ultimate issue of likelihood of confusion is a question of law"). To resist summary judgment in a case where the likelihood of confusion is the dispositive issue, a nonmoving party must establish, through pleadings, depositions, answers to interrogatories, admissions and affidavits in the record, that there are genuine factual disputes concerning those *Frisch's* factors which may be material in the context of the specific case. *Homeowners Grp.*, 931 F.2d at 1107. With this understanding in mind, we review each factor to inform us whether or not there is a reasonable likelihood of confusion.

**1.     Strength of the mark**

The strength of the mark factor "focuses on the distinctiveness of a mark and its recognition among the public." *Therma-Scan*, 295 F.3d at 631; *see also Homeowners Grp.*, 931 F.2d at 1107 ("[a] mark is strong if it is highly distinctive, i.e., if the public readily accepts it as the hallmark of a particular source"). "The more distinct a mark, the more likely is the confusion resulting from its infringement, and therefore, the more protection it is due." *Daddy's Junky Music Stores*, 109 F.3d at 280. Accordingly, a strong mark enjoys greater protection.

As this Court has explained, the strength evaluation encompasses two separate components: "(1) 'conceptual strength,' or 'placement of the mark on the spectrum of marks,' which encapsulates the question of inherent distinctiveness; and (2) 'commercial strength' or 'the marketplace recognition value of the mark.'" *Maker's Mark Distillery, Inc. v. Diageo N. Am., Inc.*, 679 F.3d 410, 419 (6th Cir. 2012) (quoting 2 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 11.83 (4th ed.)).

A mark's distinctiveness and resulting conceptual strength "depends partly upon which of four categories it occupies: generic, descriptive, suggestive, and fanciful or arbitrary." *Therma-Scan*, 295 F.3d at 631 (internal quotation marks omitted). A descriptive mark "specifically describes a characteristic or ingredient of an article," while an arbitrary mark "has a significance recognized in everyday life, but the thing it normally signifies is unrelated to the product or service to which the mark is attached, such as CAMEL cigarettes or APPLE computers." *Id.* (internal quotation marks and brackets omitted). "A descriptive mark, by itself, is not protectable." *Innovation Ventures, LLC v. N.V.E., Inc.*, 694 F.3d 723, 730 (6th Cir. 2012). However, a "merely descriptive term can, by acquiring a secondary meaning, *i.e.,* becoming distinctive of the applicant's goods, become a valid trademark." *Id.* (internal quotation marks and ellipses omitted); *see Induct-O-Matic Corp. v. Inductotherm Corp.*, 747 F.2d 358, 364 (6th Cir. 1984) (descriptive mark becomes distinctive through advertising and reputation).

The district court found that Progressive's OrderLink mark was conceptually weak because it described the function it serves—processing its clients' orders through final fulfillment. Neither party disputes that the mark was descriptive. Rather, Progressive believes that the district court erred in finding OrderLink's mark was weak because it has achieved incontestable status. The district court rejected this argument finding that incontestable status gives rise to a presumption of strength—a presumption which can be rebutted by a showing of extensive third-party use. UPS presented evidence of third-party use and co-existence in the order processing industry, which Progressive has not disputed. Furthermore, the district court found that Progressive failed to establish commercial strength—recognition of the mark in the marketplace—because the record was "devoid of any evidence that Progressive's advertising efforts have translated into marketplace recognition." We review each conclusion below.

### a.          Incontestable status and distinctiveness

Progressive argues that the district court erred by concluding that Progressive's OrderLink mark was weak. Relying upon *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 205 (1985), Progressive contends that under the Lanham Act an incontestable[4] mark is "conclusive evidence of validity, ownership and exclusive right to use." (Appellant Br., at pg. 27). It is not a mere presumption as stated by the district court. We disagree.

The doctrine of incontestability and its evidentiary value is outlined in both 15 U.S.C. §§ 1065 and 1115(b). And while there is no dispute that incontestable status serves as conclusive evidence of the registrant's exclusive right to use the mark, *Park 'N Fly, Inc.*, 469 U.S. at 196, such use remains "subject to proof of infringement as defined in [§] 1114." 15 U.S.C. § 1115(b). This Circuit has clearly noted that even where a trademark is incontestable:

> [T]he significance of its presumed strength will depend upon its recognition among members of the public. Treating a valid, incontestable mark as an exceptionally strong mark for the purpose of determining whether confusion is likely to occur, without examining whether the mark is distinctive and well-known in the general population, would shift the focus away from the key question of "whether relevant consumers are likely to believe that the products or services offered by the parties are affiliated in some way" . . . . Although a trademark may be "strong and worthy of full protection" because it is valid and incontestable . . . that does not necessarily mean that its strength is particularly relevant to the ultimate issue of whether confusion is likely to occur.

*Therma-Scan*, 295 F.3d at 632 (citations omitted); *see also AutoZone, Inc. v. Tandy Corp.*, 373 F.3d 786, 794 (6th Cir. 2004); *Lucky's Detroit, LLC v. Double L, Inc.*, 533 F. App'x 553, 557 (6th Cir. 2013) ("[defendant] correctly relies on [this Court's] decision in *Therma-Scan* for the proposition that a court must weigh the conceptual *and* commercial strength of a mark, even where it determines that a mark is valid and incontestable.").

To the extent that Progressive wishes to rely solely upon the incontestable status of the mark, that by itself, is not sufficient when UPS has come forward with evidence of descriptiveness, third-party use, and a lack of commercial strength. *See Kibler v. Hall*, 843 F.3d

---

[4] An incontestable mark is one that has not been successfully challenged within five years of registration. *See* 15 U.S.C. § 1065. Neither party challenges the fact that Progressive's mark is incontestable.

1068, 1074 (6th Cir. 2016) (holding that even in the face of a presumption of incontestability, plaintiff's mark may be weak if it is not commercially strong).  Undoubtedly, Progressive's claim of incontestability is entitled to a presumption of strength.  However, a party may rebut the presumption of strength and show that a mark is not distinctive by presenting evidence of "extensive third party use of similar marks."  *AutoZone, Inc.*, 373 F.3d at 794 (emphasis omitted); *cf. Lucky's Detroit, LLC*, 533 F. App'x at 557 (finding that defendant failed to present any evidence that businesses were actively using the marks). Third-party use weakens a mark because the mark is not an identifier for a single source.  *Citizens Banking Corp. v. Citizens Fin. Grp., Inc.*, 320 F. App'x 341, 347 (6th Cir. 2009).  The presumption is that the third parties have muddled the mark's source.  *Kibler*, 843 F.3d at 1074.

UPS has come forward with evidence that there was third-party use of nearly identical marks for the same or similar services as Progressive's.  This included a list of ten uses of the term "order link" and its phonetic equivalents that have been used in connection with order fulfillment services and related services since as early as 1991.  These terms appeared in use along with Progressive's OrderLink mark in internet search results.  Progressive challenges whether ten alleged uses are sufficient to show the weakness of Progressive's mark and defeat the presumption of strength it enjoys stemming from its incontestability.  But there does not appear to be a specific number of third-party uses that are sufficient; rather, context matters.  *See Florida Int' l Univ. Bd. of Trustees v. Florida Nat'l Univ., Inc.*, 830 F.3d 1242, 1258 (11th Cir. 2016) (twelve third-party uses can be sufficient to diminish the distinctiveness of a mark); *AmBrit, Inc. v. Kraft, Inc.*, 812 F.2d 1531, 1539 (11th Cir. 1986) (finding that less protection was available where eight third-party users in the same market employed a similar wrapper).  In the instant case, each of the third-party uses is virtually identical to the mark at issue, is in the same relevant field, and is advertised primarily through the internet.  The extensive third-party use undermines any presumption of distinctiveness that Progressive's mark may have enjoyed from its incontestable status.

### b.      Commercial strength

"Because the strength of a trademark for purposes of the likelihood of confusion analysis depends on the interplay between conceptual and commercial strength, the existence or non-

existence of distinctiveness is not the end of the inquiry." *Maker's Mark*, 679 F.3d at 419. A mark can be "conceptually strong without being commercially strong, and thus weak under *Frisch*." *Kibler*, 843 F.3d at 1074. So to properly evaluate the full strength of a mark, we must analyze the extent of its commercial recognition. A mark's commercial strength depends on public recognition, or the extent to which people associate the mark with the product it announces. *Maker's Mark*, 679 F.3d at 419.

Survey evidence is the most persuasive evidence of commercial recognition. *See*, *e.g.*, *id.* at 421; *Frisch's Rest., Inc. v. Shoney's Inc.*, 759 F.2d 1261, 1265 (6th Cir. 1985) (relying on evidence that around thirty percent of respondents identify non-plaintiff restaurants with plaintiff's mark to conclude mark is commercially weak). However, it is by no means a requirement. Proof of marketing may be sufficient to support a finding of "broad public recognition." *Therma-Scan*, 295 F.3d at 632. Conversely, proof that third parties have extensively used a trademark or similar trademarks in the relevant market may indicate that the trademark is commercially weak. *Homeowners Grp.*, 931 F.2d at 1108.

Progressive argues that the district court erred because "there is no question that Progressive ha[d] a commercial presence on the internet in e-commerce for [OrderLink] prior to UPS saturating the marketplace." (Appellant Br., at pg. 33). It further points to its efforts in advertising of the mark and notes "most straightforward depiction of commercial strength is set forth as search results on Google and Bing where UPS OrderLink pervades the search results and . . . OrderLink is the only other result reported in the search." (*Id.*). Despite its assertions of an extensive internet presence, Progressive provides only minimal evidence to support its statements. In fact, the only evidence in the record that exists which can speak to Progressive's commercial presence is the aggregate sum of Progressive's advertising costs. But that by itself is not enough to avoid summary judgment. The operative question remains whether Progressive has provided evidence "that would permit a reasonable jury to determine that wide segments of the public" previously recognized OrderLink as a mark associated with Progressive's brand. *See Kibler*, 843 F.3d at 1075 (rejecting the argument that merely showing that promotion of a brand on social media was sufficient to avoid summary judgment when there was no specificity as to the impact of the marketing). There is no evidence in the record showing the specific

impact of Progressive's advertising campaign or the degree of consumer recognition of Progressive's mark. In fact, the evidence in the record indicates that Progressive has struggled to secure any new clients for its OrderLink service even preceding UPS's entry into the market.

In the alternative, Progressive argues that the district court erred in its analysis by failing to recognize the distinction between a forward and reverse confusion claim. The dissent adopts a similar line of reasoning and claims that "the proper focus in reverse confusion cases is whether the senior user's mark is *commercially* weaker than the junior user's mark." Notably, the dissent relies exclusively upon out-of-circuit precedent for this conclusion. But while certain circuits have adopted a different test for claims of forward and reverse confusion, the Sixth Circuit is not one of them. *See Therma-Scan, Inc.*, 295 F.3d at 640 ("the presence of a reverse confusion claim does not alter this analysis."). To the extent the dissent suggests this Court held to the contrary in *Ameritech, Inc.*, 811 F.2d at 960, it is mistaken. In *Ameritech*, this Court concluded that reverse confusion claims were cognizable. But we never distinguished between reverse or forward confusion claims in analyzing the strength of the mark factor. And we certainly never held that a plaintiff's showing that his mark is weak "is the very foundation of reverse confusion." Rather, this Court explicitly stated that "the stronger a trademark, the greater the protection afforded." Our basis for reversing the district court's dismissal of plaintiff's reverse confusion claim in *Ameritech* was our recognition that a mark "might be weak in the national market, but might still be strong in the senior user's geographical and product area and thus deserving of protection." *Ameritech, Inc*, 811 F.2d at 966–67. Contrary to the dissent's assertion, this Court has never found that merely showing that a plaintiff's mark is weaker than a defendant's is sufficient in order for a plaintiff to prevail on a claim of reverse confusion.

Progressive directs our attention to the fact that UPS "flooded the market" with its mark. There is, of course, no surprise that UPS's brand is stronger than Progressive's. But this Court is unsure how the rapidity with which Progressive may have been muscled out of the market— perhaps within a few months—supports Progressive's argument that it previously had a strong commercial presence in the aforementioned market. If anything, this argument appears to cut the other way, undermining any claim Progressive may have to broad commercial recognition. While the district court is not permitted to weigh evidence on summary judgment, there is no

indication from the evidence put forward by Progressive that a reasonable juror might conclude that its mark maintained a strong commercial presence in the market. This finding, coupled with our previous discussion concerning the lack of distinctiveness of Progressive's mark, indicates that the strength of the mark factor favors UPS.

### 2.          Relatedness of the services

This Court has established three benchmarks to consider when evaluating the relatedness of the parties' goods and services. "First, if the parties compete directly, confusion is likely if the marks are sufficiently similar; second, if the goods and services are somewhat related, but not competitive, then the likelihood of confusion will turn on other factors; finally, if the products are unrelated, confusion is highly unlikely." *Kellogg Co. v. Toucan Golf, Inc.*, 337 F.3d 616, 624 (6th Cir. 2003). Goods and services are not necessarily related just because they "coexist in the same broad industry." *Homeowners Grp.*, 931 F.2d at 1109. Instead, the relatedness inquiry focuses on whether goods or services "that are similarly marketed and appeal to common customers are likely to lead consumers to believe that they 'come from the same source, or are somehow connected with or sponsored by a common company.'" *Therma-Scan,* 295 F.3d at 633 (quoting *Homeowners Grp.*, 931 F.2d at 1109).

The district court found that the services are related but do not directly compete because there is no evidence that "Progressive's order fulfillment service and UPS's shipping application, which simply allows eBay and Amazon merchants to print shipping labels and manage shipments of goods sold[,] . . . compete in performing the same functions for customers." (R. 157, Opinion, PageID # 3781). Nonetheless, the court found that because Progressive "use[s] and incorporate[s] UPS's services as part of Progressive's total package of order fulfilment services provided to its clients . . . this factor is neutral." (*Id.*). Progressive contends that the district court erred by not viewing the facts and inferences in the light most favorable to Progressive. Instead, as Progressive argues, the services directly compete, are incorporated into one another, and otherwise overlap.

Despite Progressive's argument to the contrary, we agree with the district court's conclusion. While we recognize that both services operate in a similar broad industry—shipping

and order fulfillment—Progressive all but concedes that the services are not competitive. Progressive claims that its OrderLink platform allows its customers to "completely outsource their order fulfillment functions to Progressive." This entails Progressive building websites, taking orders, managing inventories, shipping orders and providing customer services. This service costs a substantial amount of money and requires at least a two-year contract. In contrast, UPS's OrderLink is free of charges, does not come with a binding commitment, and is only available to existing customers for the purposes of linking their orders from their eBay or Amazon account. Just because there is some overlap between the two services, it does not follow that the companies compete directly for the same base of customers. *See Therma-Scan*, 295 F.3d at 633 (goods and services that utilize similar technologies but function in different ways are not necessarily related). There is no indication that the companies market their goods and services to the same targeted individuals. *See id.* (discussing how the two companies market their goods to different segments of the population). Regardless of how much one tries to draw inferences in Progressive's favor, it is difficult to see how a prospective customer could confuse the "free" service offered by UPS exclusively to its existing customers with that of the expensive and all-encompassing service marketed by Progressive. At best, this factor is neutral and does not weigh in favor of either party.

### 3.     Similarity of the marks

"Similarity of marks is a factor of considerable weight." *Daddy's Junky Music Stores*, 109 F.3d at 283. In evaluating whether the mark is similar, a court should not examine the marks side by side but instead "must determine, in the light of what occurs in the marketplace, whether the mark 'will be confusing to the public when singly presented.'" *Wynn Oil Co.*, 839 F.2d at 1187 (internal citations omitted). In assessing similarity, a court should consider the "pronunciation, appearance, and verbal translation of conflicting marks." *Leelanau Wine Cellars*, 502 F.3d at 516–17 (quoting *AutoZone, Inc.*, 373 F.3d at 795–96).

The district court conceded that both marks contained the word "ORDERLINK." It nonetheless concluded that the marks "are not very similar." (R. 157, Opinion, PageID # 3782). The inclusion of UPS's house mark in the "UPS OrderLink," as well as the UPS shield and brown and gold colors "render the visual presentation and pronunciation of UPS's mark

different from Progressive's [OrderLink] mark." (*Id.*) Progressive argues that the marks are "exactly the same. They appear the same and sound the same." (Appellant Br., at pg. 39). Furthermore, Progressive points to the USPTO's rejection of UPS's trademark application on grounds that the UPS mark "consists of the registered mark in its entirety . . . modified by the addition of the term UPS." Therefore, according to Progressive, this factor strongly supports a finding that confusion is likely to occur, or at the very least creates a material issue of fact on the question.

But even assuming the version of the facts as presented by Progressive, and making all inferences in its favor, this Court disagrees with Progressive. Although the respective marks use the same words, the focus of our inquiry is much broader inasmuch as we are obligated to evaluate the marks as they appear in commerce—not just as they appear in black and white. *See Homeowners Grp.*, 931 F.2d at 1109. Furthermore, any findings made by the USPTO examiner are devoid of appropriate marketplace context, and therefore, not entirely persuasive. But more importantly, when we analyze the marks as they appear in the marketplace, we see little basis for similarity. The respective marks are displayed in different colors and fonts and depicted with distinct design elements. The "UPS OrderLink" mark contains the UPS shield along with its recognizable brown and gold color scheme. In contrast, Progressive's mark is green and blue. As this Court has already stated in *AutoZone, Inc.*, 373 F.3d at 797, the inclusion of a house mark can "reduce[ ] the likelihood of confusion from any similarity that does exist."[5] This is especially true when one mark—namely that of UPS—is so easily recognizable and associated with a strong and popular brand, whereas Progressive's mark lacks comparable recognition. In the instant case, we cannot imagine that any reasonable consumer, when looking at the two marks as they appear in commercial context, would confuse the two marks. Accordingly, this factor militates against a finding of any likelihood of confusion.

---

[5]While it is true that some courts have recognized that the addition of a junior user's house mark to a senior user's may create the potential for reverse confusion, *see, e.g., Americana Trading Inc. v. Russ Berrie & Co.*, 966 F.2d 1284, 1288 (9th Cir. 1992), there is no blanket rule for all cases of reverse confusion. As this Court has stated, the only question that must be answered is whether there is a potential for confusion.

### 4.     Evidence of actual confusion

"Nothing shows the likelihood of confusion more than the fact of actual confusion." *Groeneveld Transp.*, 730 F.3d at 517.  With that said, evidence of actual consumer confusion is not necessary to show likelihood of confusion.  *See Frisch's Restaurant, Inc.*, 759 F.2d at 1267. Isolated instances of confusion are insufficient to support a finding of likely confusion. *Checkpoint Sys., Inc. v. Check Point Software Techs., Inc.*, 269 F.3d 270, 299 (3d Cir. 2001).

Progressive puts forward a single instance of confusion to support its showing of actual confusion.  The only example that Progressive cites involves a UPS call center employee who mistakenly telephoned Progressive to inquire about the UPS "OrderLink" service.[6]  Nonetheless, relying upon this Court's decision in *Daddy's Junky Music Stores, Inc.*, 109 F.3d at 284, Progressive argues that a single instance of confusion can support a finding of actual confusion.

We find Progressive's reliance on *Daddy's Junky Music Stores, Inc.*, misplaced. In *Daddy's Junky Music Stores, Inc.*, the one instance of confusion involved an actual customer, not an employee.  This distinguishes *Daddy's Junky Music Stores, Inc.* from the instant case because Progressive only points to an incident of confusion involving a UPS employee, and not an actual or prospective customer of Progressive's services.  This is significant because in a trademark infringement action, the focus rests upon the likelihood of a consumer being confused by the two marks and not an employee.  *See Groeneveld Transp.*, 730 F.3d at 517 (noting that testimony of employees and affiliates that two products looked the same was not sufficient, in part, because none of the witness were consumers).

Additionally, we find Progressive's reliance on *Daddy's Junky Music Stores, Inc.* inappropriate because the circumstances of the case made it unlikely for there to be more instances of actual confusion beyond the one isolated incident that plaintiff pointed out.  *Daddy's Junky Music Stores, Inc.*, 109 F.3d at 284 (finding that there was no evidence that the same

---

[6]Progressive also claims that it received web-based inquiries from UPS sourced internet domains. However, Progressive never articulates—and certainly fails to provide any evidence to this effect—that these inquiries arose in connection with the "OrderLink" mark. Nor is there any indication that these inquiries represented instances of confusion.  Accordingly, we do not credit this fact on summary judgment, where plaintiff must do more than just introduce conclusory allegations.

individuals who "receive[d] plaintiff's mailings also receive[d] defendant's mailings"). As a general matter, courts decline to credit isolated instances of actual confusion. *See, e.g.*, *Therma-Scan*, 295 F.3d at 635 ("[s]ix confused customers is legally insignificant"); *George & Co. LLC v. Imagination Entm't Ltd.*, 575 F.3d 383, 399 (4th Cir. 2009) (four instances of consumer confusion is at best *de minimis*); *Packman v. Chicago Tribune Co.*, 267 F.3d 628, 645 (7th Cir. 2001) (discounting four callers as *de minimis* evidence of confusion).

In the present case, Progressive argues that UPS saturated the market with its mark, overwhelming Progressive's steady stream of advertising and strong commercial presence. However, if this is true, presumably rampant opportunity existed for actual confusion to occur. Instances of confusion should have been abundant. We believe that if there are a large volume of contacts or transactions, which could give rise to confusion, and only limited instances of confusion present themselves, then evidence of actual confusion should receive little weight. McCarthy § 23:14; *see also George & Co.*, 575 F.3d at 399 ("[T]he company's failure to uncover more than a few instances of actual confusion creates a presumption against likelihood of confusion in the future" when there are so many opportunities for confusion to occur) (internal citations omitted). Given the record before us, we conclude that this factor weighs in favor of UPS.

### 5.        Marketing channels

In considering this factor, courts must determine "how and to whom the respective goods or services of the parties are sold." *Leelanau Wine Cellars, Ltd.*, 502 F.3d at 519 (quoting *Gen. Motors Corp. v. Keystone Auto. Indus., Inc.*, 453 F.3d 351, 357 (6th Cir. 2006)). There is less likelihood of confusion where the goods are sold through different avenues. *Id.* "Where the parties have different customers and market their goods or services in different ways, the likelihood of confusion [also] decreases." *Therma-Scan*, 295 F.3d at 636. Progressive contends that "the overlap between the marketing and advertising is palpable." (Appellant Br., at pg. 44). It points to the fact that both parties market their services through the Internet, mailers, cold-calls, and key word searches through Google and Bing. Progressive concedes that the marketing channels are not exactly the same, but believes that they are sufficiently similar so as to merit a finding in its favor.

But as the district court correctly noted, just because the two parties market their products on the Internet does not "automatically lead to the conclusion that they use common marketing channels." *See id.* at 637. Most of UPS's marketing occurred primarily on its website. The customers it targeted were pre-existing UPS customers that sold goods on eBay and Amazon. While Progressive's website no doubt contains some promotional material for its OrderLink service, the service cannot be purchased or used without first speaking to a Progressive representative. The primary method that Progressive used to advertise its service was through the use of paid search engines. Progressive also never targeted customers who were exclusively Amazon or eBay merchants in their advertising. In sum, the evidence shows that while some overlap in marketing may have occurred, the parties generally targeted entirely different consumers, offered diverse services, and relied upon distinct channels. Accordingly, this factor favors UPS.

### 6.       Likely degree of purchaser care

Generally, the standard for determining whether a likelihood of confusion would arise is predicated upon an ordinary buyer exercising ordinary caution. A "higher degree of care, in contrast, is appropriate where the buyer in question has a particular expertise or sophistication." *Homeowners Grp.,* 931 F.2d at 1111. "This expectation of greater attention, where appropriate, diminishes the likelihood of confusion." *Therma-Scan*, 295 F.3d at 638.

The district court found that Progressive markets its order fulfillment services to business seeking "to completely outsource their order fulfilment operations . . . . In short, this is not an impulsive purchase of an inexpensive item made at the checkout lane of a grocery store." (R. 157, Opinion, PageID # 3785–86). Given these circumstances, the court concluded that it was likely that Progressive's customers exercised a high degree of care in purchasing services. It made a similar finding for UPS's customers and concluded that this factor weighed substantially in favor of finding of no confusion.

We see no error in this conclusion. Progressive attempts to muddy the issue by claiming that an overlap exists between the merchants targeted by its service and by UPS. However, this focus is not appropriate. The significant investment required in selecting Progressive's services,

and the commercial aspect of UPS's customer base suggests that the individuals who would be utilizing either service would be unlikely to confuse the two parties. Accordingly, this finding cuts against a likelihood of confusion.

### 7.     UPS's intent

Progressive next argues that the district court erred when it concluded that UPS had no intent to benefit from Progressive's mark. It also claims error when the district court rejected its argument that UPS demonstrated bad intent by failing to discontinue its use of the mark. Courts have held that "[i]f a party chooses a mark with the intention of creating confusion between its products and those of another company, 'that fact alone may be sufficient to justify an inference of confusing similarity.'" *Therma-Scan*, 295 F.3d at 638 (quoting *Daddy's Junky Music Stores, Inc.*, 109 F.3d at 286). Circumstantial evidence of copying, particularly the use of a contested mark with knowledge that the mark is protected, may be sufficient to support an inference of intentional infringement where direct evidence is not available. *Id.* at 638–39. However, knowledge of a trademark, alone, will not support a finding of intent to confuse if other circumstances show that the defendant believed there was no infringement. *See AutoZone, Inc.*, 373 F.3d at 800. Moreover, a finding of "bad-faith intent to infringe upon another mark may not increase the likelihood of confusion if the other seven factors suggest that confusion is improbable." *Id.* at 799.

There is some dispute concerning whether or not UPS displayed bad faith. Certainly, UPS was aware that Progressive had previously registered the "OrderLink" mark. From this fact, an inference may be drawn that UPS was aware of the potential for confusion as a result of Progressive's prior use. Conversely, UPS has presented evidence undermining a finding of bad intent. Specifically, UPS points to testimony in which its employees acknowledge Progressive's mark but also note that they did not believe such prior use would result in a likelihood of confusion because many companies used similar marks and because the products appear substantially different. We find the evidence put forward by Progressive on bad intent to be equivocal, and accordingly, deem this factor to be neutral.

**8.       Expansion of product lines**

There is no evidence in the record that either party intends to further expand its operations or services with respect to the competing marks.  Accordingly, the Court does not consider this factor. [7]

**9.       Summary of factors**

As this Court has held, in the course of applying the *Frisch* factors, "[t]he ultimate question remains whether relevant consumers are likely to believe that the products or services offered by the parties are affiliated in some way."  *Homeowners Grp.*, 931 F.2d at 1107.  The factors "imply no mathematical precision, but are simply a guide to help determine whether confusion is likely."  *Id.*  And a court may find "that at least one factor favors the nonmoving party" while ultimately concluding that the disputed factor is not sufficient to preclude summary judgment.  *Mktg. Displays, Inc.*, 200 F.3d at 934.  The balance of the factors, including the most significant ones—namely the strength of the mark and the similarity of the marks, *see Maker's Mark*, 679 F.3d at 424 (highlighting what the most important factors are in a likelihood of confusion analysis)—favor UPS.  Accordingly, summary judgment is appropriate.

## CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's decision to grant summary judgment.

---

[7]Progressive argues that the District Court "misunderstood Progressive's argument and presentation relating to this factor."  (Appellant Br., at pg. 56).  However, it does not provide any evidence that either party intends to further expand its operations or services.  Conclusory allegations that "UPS expanded the quantity of those services performed, the quantity of advertising and marketing of those services, and the linkage of UPS ORDERLINK with UPS Marketplace Shipping," *id.*, are not persuasive.

---

## CONCURRING IN PART AND DISSENTING IN PART

---

RALPH B. GUY, JR., Circuit Judge, concurring in part and dissenting in part.  I concur in the majority's thorough and well-written opinion in all but one respect.  The majority fails to recognize the error made by the district court in conflating forward confusion and reverse confusion.  The distinction between forward and reverse confusion is important because in applying the first *Frisch* factor, the strength of plaintiff's mark, a conclusion that the mark is weak supports a claim for reverse confusion.  In fact, it is the very foundation of reverse confusion.

As the Third Circuit observed in *A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*:

> [I]n a direct confusion claim, a plaintiff with a commercially strong mark is more likely to prevail than a plaintiff with a commercially weak mark.  Conversely, in a reverse confusion claim, a plaintiff with a commercially weak mark is more likely to prevail than a plaintiff with a stronger mark, and this is particularly true when the plaintiff's weaker mark is pitted against a defendant with a far stronger mark.

237 F.3d 198, 231 (3d Cir. 2000); *see also Big O Tire Dealers, Inc. v. Goodyear Tire & Rubber Co.*, 561 F.2d 1365, 1367-68, 1372 (10th Cir. 1977) (jury could find reverse confusion where large junior user's multi-million-dollar nationwide advertising campaign overpowered small senior user's mark).  We suggested the propriety of this approach in *Ameritech*, which the majority cites.  *Ameritech, Inc. v. Am. Info. Techs. Corp.*, 811 F.2d 960 (6th Cir. 1987).  There, we observed that the senior user in a reverse-confusion case "loses the value of the trademark – its product identity, corporate identity, control over its goodwill and reputation, and ability to move into new markets," and relied on the junior user's comparatively massive brand recognition to rule that the senior user was entitled to consideration of its reverse-confusion claim.  *Id*. at 964-66.

Although it is true that plaintiff alternatively argued that its mark is strong, it premised this argument on *conceptual* strength because the mark is registered and incontestable.  The majority correctly rejected this argument in light of the mark's descriptiveness, third party use,

and lack of commercial strength.  Opinion, *supra*, at 13.  But, as discussed above, the proper focus in reverse-confusion cases is whether the senior user's mark is *commercially* weaker than the junior user's mark.  *See A&H Sportswear*, 237 F.3d at 231.  Plaintiff argued the comparative commercial weakness of its mark when it cited "search results on Google and Bing where UPS OrderLink pervades the search results" to show that UPS "overwhelmed Progressive on the internet in e-commerce[.]"

Favoring a senior user's comparatively weak mark preserves the distinction between forward- and reverse-confusion claims.  The district court instead applied the forward-confusion analysis and concluded that Progressive's weak mark weighed against a finding of likelihood of confusion.  It thereby erred.

One cannot predict whether the district court would have reached a different result applying the correct analysis.  The majority is right that certain factors weigh strongly in defendant's favor, namely the lack of evidence of actual confusion and the likely high degree of purchaser care.  But in this circuit, "the most important . . . factors are similarity and strength of the mark[.]"  *Maker's Mark Distillery, Inc. v. Diageo North America, Inc.*, 679 F.3d 410, 419 (6th Cir. 2012) (quotation omitted).  I would remand to the district court to reconsider summary judgment in light of the weakness of Progressive's mark compared to the commercial strength of UPS's mark.